would like to focus the court on what I see to be two fundamental errors in the district court's opinion below. First, that there was evidence supporting a legitimate non-discriminatory reason for Ms. Forte's termination. And secondly, that there was no evidence upon which a reasonable juror could conclude that this purported justification was pretext. And as far as the performance It's really not the test, is it? Isn't the test whether or not there is a reasonable possibility, whether or not there is a question for the jury in light of the evidence that is presented? So you could have, for instance, mixed performance reviews, some of which are positive, some of which are negative, and that would not overcome the claim of the plaintiff. I think that's right. In discrimination cases, we look at the totality of the evidence to see whether there's really a jury question there. Absolutely, Your Honor. So there may be isolated points that one can point to on either side, but that's not going to be necessarily determinative. I think that's what you're about to do. I understand, Your Honor. I think that's where the you can look at it this side or from that side. You're weighing it and trying to decide by a fair preponderance who's going to win. Of course, that's not permissible. Exactly. The question is whether or not the evidence is such that there's a reasonable possibility that the jury could find for the plaintiff. And I think that's what happened here. I think the judge started to cross over into weighing the evidence. Can you give us examples of where the district court weighed the evidence? Well, for example, this whole question of who Ms. Forte's comparators were for purposes of determining whether— You're a little too close to the mic. Sorry. Let me move it back. Okay. There we go. Our position is that her comparators were Alfred Escondar, who was the person who had the job before her. And then after she left, Seth Marin, the owner of the company, brought in two males to replace her and essentially divided her responsibilities. But Mr. Escondar had been on that job for 10 years or so. She had been on the job for one. Isn't that right? That's correct, Your Honor. But Ms. Forte had spent 20 years— The base pay wasn't that different. Well, the base pay wasn't that different. But if you look at the entire small company like this—smaller. I mean, it was $500 million. It's not that small, but there aren't that many people working there. You leave a Goldman Sachs or one of these other types of firms because you're hoping to get some stock options and take a piece of the upside. So this bonus stock was a very important part of it. And with respect to this tenure issue— If you looked at the entire compensation package, what was the difference between her and Escondar? Double. He was paid double. And as far as— After 10 years on the job, and she had been there for one. But she'd been in the business for 30 years, and she was 20 years as the head of sales at DLJ. Escondar was a marketing guy. He had just started the sales job, which is probably why he left shortly after Ms. Forte joined. Marin got rid of him. And so she winds up being promoted to his job within days of having started with the firm, which gets me— You're saying that this seniority or the tenure, his tenure in the position, should have nothing to do— That doesn't disqualify him as a comparator? Exactly. Because what we're talking about in a Wall Street firm like this is how they determine compensation. It's what have you done for me this year? I mean, they want to see what your revenue responsibility is, how you've increased sales. I mean, there's a small kind of amorphous factor about corporate citizenship. But the bottom line is how much money you bring in the firm determines how much you get paid. You can be there for 20 years, and you have a bad year. Your compensation's going down. That's the way it works. There's no tenure on Wall Street, as I mentioned. I wanted to say this to the district judge, but this is actually the first time we've been in front of an Article III judge in this case. We were in front of the magistrate several times, and we never had so much as a telephone conference with Judge Torres. So I'm grateful to be here today. Can we go back to the company's reasons for termination here? So there were negative reports starting in the middle of 2012 about her, that she was late for meetings, that she wasn't showing up, that she canceled meetings at the last minute, that there was poor monitoring, that she delegated her own direct responsibilities. And Marin met with her in 2012 and 2013, and she was aware of his displeasure in the fall of 2012 when she reported that he had read the Riot Act to her. There was no mention of discrimination at that time, and so there was a period of evaluation going on here. Now, Kelly gave her generally positive evaluations, but Marin was going deeper than that and looking at her subordinates and so forth and what they were saying, and he came to not have confidence in her. Now, how is that a pretext for discrimination? That's because that's his story that he came up with after this lawsuit was filed. It's not just his story. It's buttressed by detailed testimony from everybody else. Unless you're going to say they're all lying. Well, I- 13 or 15 people are sworn affidavits and lie. You have to take a look at the affidavits. I have. Yes. I understand, Your Honor. They work in your advantage, frankly. No, I don't think they work in our advantage, but they do have telltale signs of having been created after the fact. What affirmative evidence? Of course they were created after the fact. That's when the affidavits were signed. But the question is, were they truthful or not? I understand, Your Honor. Well, I think, and you really put your finger on the point that I was about to launch into, which is if you look at the record in the case, prior to the July 2013 meeting with Marin, where he says he gave her a final warning, she says that did not happen, there is no disciplinary record. There's one email that Lejean sent in 2012 saying, he read me the Riot Act, he's unhappy with sales. Sales was on the ropes because of this whole SEC investigation. They lost 60 of their customers, and Ms. Forte got 47 of them back. But other than that email, which is her email, and she's just saying he's upset about sales. She's not saying he's upset about me. He wants to see this unit going better. And there is no record of performance up until you get to this email that he sends to Jerry Madrea, the HR person, in July of 2013 saying, I just spoke with her and I gave her a final warning. And then I take his deposition in the case, and he says nobody gave her a final warning. Then it's five months later that she's terminated. I mean, it's not a final warning, and then she's terminated the next day. And I think she would have been terminated sooner if Kelly wasn't trying to prevent that, because he saw she was a quality person and was doing a good job for the firm, and he was supposed to be running the firm. I mean, Marin brought him in. You're out of time. You've saved two minutes for rebuttal. Thank you. Now hear from the other side. It pleases the Court. Michael Weber and Joshua Kaman for the defendants and appellees. I want to just focus on a couple of points raised. Seth Marin, the defendant, hired the appellant and terminated her. And as Judge Walker observed, there's multiple emails and admissions in the record as to the performance issues, substantive performance issues, as to why they took the acts they took. Number two. There are also positive evaluations. Why isn't there an issue of fact as to the quality of her performance? I mean, granted, there's lots of evidence of bad performance, but there's also some evidence of good performance. There is, Judge Shin. The law is that you can have supervisors with a different point of view on an employee's performance. I understand that, and at trial, a jury could certainly say, we think these 11 affidavits far outweigh the positive evaluations. But the question is, at the summary judgment stage, is the court not weighing the evidence when it decides that the 11 affidavits are more persuasive than the good evaluations? Judge Shin, I think you have to look at the underlying issues here. Was there gender discrimination? Well, I understand that, but the cause, the purported reason for termination is performance. And if there's an issue of fact as to performance, then there's other evidence as well, but why isn't there an issue of fact on performance? Because the very person who gave some positive evaluations was in full support of the termination and stated in deposition affidavits that discrimination was not a factor, that it was a performance-based termination, along with the CEO, Defendant Marin. And CEO Marin made it clear on numerous occasions to the plaintiff that he had serious concerns with her performance over a year-and-a-half period. So I think, yes, there was some positive feedback, but overall the performance issues trumped anything else. And it was not just the CEO, Defendant Marin, and not just the COO, but multiple subordinates who testified through affidavit about her deficiencies. And the plaintiff has not rebutted those. Hasn't the plaintiff offered evidence of remarks made by Mr. Marin and others, and behavior such as not being invited to a meeting after a closing, and we have that girl in charge of our company's revenues, and the reference to the Saturday Night Live routine about that slut? Doesn't that combine with the ambiguity about their performance as well as conflicting testimony about the timing and impetus behind the termination to create enough of a set of factual disputes to get to a jury? No, Judge Carney, because, one, many of those statements are denied by Defendant Marin. Two, they're isolated, unrelated to performance of the plaintiff. Three, they're unrelated to anything to do with the timing of her termination. They're isolated comments that have nothing to do with her performance. We don't know when they were made, who they were made to, who was present. They're just isolated comments. Did she claim here at all of a hostile work environment? No. Or not? No, Your Honor. I think Judge Torres found there was no evidence whatsoever. Nonetheless, she did examine those claims and ruled that there was no basis whatsoever. There's no facts in the record. Didn't she say that there had been a claim to that effect, but it had been abandoned? I'm sorry, Your Honor. Didn't she say that there had been a hostile work environment claim that had been abandoned? And she had abandoned it. She did, and a footnote in her decision. Is it true that in the 15 years of existence of the firm, the plaintiff was the only female executive? No, Your Honor. Head of HR, Jerry Madria, had been at the company a long time. And I think that argument cuts against the appellant. It was Defendant Marin who brought on Ms. Forte. He promoted her to this very significant position, very highly paid. And if I may just turn to footnote four of our brief on page 14. Mr. Eskandar did not receive double the compensation. He didn't receive the RSUs or the stock options that are referred to by plaintiff's counsel. Their compensation was comparable, although they were not similarly situated. Much longer tenure, much more experience, much longer, obviously, at the company. She's failed to come up with any significant documentation or evidence supporting gender discrimination. And that, I think, is the bottom line here. There's lots of noise about, you know, statements about discrimination, but there's no evidence. And I think Judge Torres was correct in ruling on summary judgment in that regard. And I think, as you noted, Judge Walker, this is not a case for the jury. There's no evidence here. There's no suggestion that gender played a role here. Is there an issue of fact as to what Eskandar was paid totally versus what she was paid? I don't think so. I mean, the plaintiff argues that it was $1,006,000 for Eskandar in 2010, $1,003,000 in 2011, and plaintiff was paid about half of that. Your Honor, as I mentioned in footnote 4 of our brief on page 14, those arguments are just not true. He was not paid that amount. Like many of the senior executives of the company, there were potential RSUs and stock options. He didn't receive them. And there's no evidence in the record that he did. And moreover, there's no evidence that he's similarly situated to her. As Judge Walker noted, he was there and Judge Carney for 11 years more than she was. You're saying the record does not support the plaintiff's claim as to his compensation? That's correct, Your Honor. And that's why I point on footnote 4. You'd say there's no dispute of fact about that because the record just doesn't support the evidence. Yes, Your Honor. That's exactly what I'm saying. Leslie, and it was not touched on, but Judge Torrey spent a great deal of time on excluding the executive report. And I want to just emphasize that I think there is no question that that report was faulty in every respect. It didn't account for any nondiscriminatory factors in the decision. Did it look at the entire sales forces? The report took all the evidence that the plaintiff gathered. And she had many opportunities and got virtually everything she asked for from either the magistrate judge or Judge Torres. But the pool of employees who were considered, did it encompass all sales employees, male and female, for the two years in question? I believe . . . Or were they selected? Well, number one, the plaintiff gathered that data and gave it to the expert, and I believe it was all the sales reps involved. Excuse me. Those are at the subordinate level. It did not include the executive level. It was basically the raw numbers, right? Correct, Your Honor. It wasn't validated, and it didn't account for tenure or service, that kind of thing. The variables were not factored in that could explain any differences. Exactly, Your Honor. And that's why Judge Torres ruled. And I think she spent a great deal of time in her decision carefully analyzing that report. Does that go to weight or admissibility? I think it goes . . . The fact that there may be variations. I think it goes to both, Your Honor. I think it's so faulty, and it's failing to analyze the relevant data here, both on weight and admissibility, it shouldn't have come in. And I think the judge was right in her ruling. And could you circle back again to the performance issue and the mixture of positive reviews and negative reviews? Why isn't that enough to give plaintiff a chance to establish that it was pretext, in fact, because they were not uniform? Well, that doesn't establish pretext. You can have different views from supervisors and not show pretext. In other words, your point, I guess, is that we're not sitting to decide whether she should have been fired or not. We're really trying to decide whether there was discrimination here. And the fact that different people have different views of her performance doesn't bear necessarily on that question. As this Court has noted, you don't sit as a super personnel agency to determine whether somebody is a good or a bad employee. That's correct, Your Honor. Was there discrimination? You can have different views. And as I mentioned before, COO Kelly said there's no discrimination here. I agree with the termination. In fact, I had told the plaintiff within the year prior to her termination. Does the judge accept that, that he denies that there was discrimination? He said that not only was there no discrimination. No, but is that the end of it, just because he says so? I mean, the question really is, of course, the employer is going to deny the discrimination. The question is whether there is enough specific, concrete evidence of discrimination in the record to support a jury verdict. And I think Judge Trois was right in saying no, there was not. Absolutely no evidence. And I think she gave a thorough analysis of all the claims and assumed whether there was any issue to the plaintiff's benefit. In her decision, she says, you know, I give her the benefit of the doubt. She asked to do that on summary judgment. Yes, Your Honor, and I think that was correct. But she did say it, contrary to what the appellant has said. She did do that and did it on several occasions in several areas. As Judge Carney noted, even where Judge noted that the plaintiff had abandoned her hostile environment claim, she still analyzed it. Same with the city claim. She said she abandoned it. There was no evidence. She still analyzed it on the record on the whole. Thank you. Thank you very much. We'll hear the rebuttal. So the argument is that there is absolutely no evidence of gender discrimination. What is the evidence? And we need specific evidence, not just conclusory beliefs. And if I may interrupt, it would need to be enough to establish that the performance issue is pretext, correct? Yes, I understand, Your Honor. As to the federal and state claims, not as to the city claim, by the way, in the Miele case from this court, it was made clear that we're dealing with a very different standard. Now, granted, the district court, if the federal claim is dismissed, could send that case back to the city claim, back to state court. But there is a different standard that we're dealing with. And let me give you some of the high points of what we rely on. Can you tie them to her, to what was done to her? Of course. And so as Judge Chitt brought up, the only senior female executive, it's actually the only female executive with revenue responsibility. The HR person was considered an executive, but she had no revenue responsibility, and the compensation was completely different. The Deputy General Counsel is a woman too, right? The Deputy General Counsel, who we called an ignorant slut, was not in the executive group that they have. It's a group of like 12 people. They have a name for it. They don't call it the executive, but it's the operational group. But she was not in that group. But she wasn't spared Mr. Merrin's slice in front of the entire firm. And so the U.S. sales force, the disparity, it was incredible. The women have more revenue responsibility. I appreciate Judge Walker's point about the expert didn't take into account tenure. But again, with the sales force, they were all the same organizational level, by the way. These are all sales reps. It wasn't just tenure. I mean, the district court relied on many factors that the expert had failed to account for. Well, she said tenure, position, organization level. Well, the organization level and the position are the same. They're all sales people. Tenure may have differed, but they're not compensated based on tenure. It's the same thing as Escondar and Forte. It's revenue responsibility, increased sales, those factors. I don't want to interfere with your answer to Judge Chin's question, though. So you're looking now to the statistical report as affirmative evidence of discrimination. Is there anything else? Exactly. Well, I have a whole list of them. But her exclusion from the board meetings, Escondar was at all of them. She went to the first couple after she pointed out the problem with maternity leave policy, where the women were not receiving credit for their commissions, and straightened that out. And after she started rectifying the compensation imbalance with the sales force, which is a part of the statistical evidence that we put in, all of a sudden she gets excluded from the board meetings. So the men are being treated differently than the women. There's Merrin's behavior, the comment about we don't want 80% of the company in this girl's hands. I think that's offensive. Nobody's saying it in this boy's hands. I mean, to talk down to somebody like that in front of their own subordinates is not appropriate. When you say Merrin's behavior, what are you referring to? Well, I'm referring to having the firm functions devolve into that kind of a discussion, him barging into the staff meeting that Ms. Forte is holding with her people, and having his girlfriend saying, I want my girlfriend to be in charge of this algo routing strategy. She's failed the series seven three times. I don't know, he's thinking maybe she'll pass it next time, but I want her running it. That kind of thing is demeaning, and he's not doing that to the men. Why is he coming into her group? Thank you. We will reserve decision.